IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:12-cv-00192-GCM

| | |
|---|---|
| NORTH CAROLINA CONSTITUTION PARTY, AL PISANO, NORTH CAROLINA GREEN PARTY, and NICHOLAS TRIPLETT, <br><br> Plaintiffs, <br><br> vs. <br><br> GARY O. BARTLETT, as Executive Director of the North Carolina Board of Elections; and LARRY LEAKE, ROBERT CORDLE, CHARLES WINFREE, and RONALD G. PENNY, as Members of the North Carolina Board of Elections, <br><br> Defendants. | ORDER |

THIS MATTER is before the Court on Plaintiffs' Motion for Preliminary Injunction to enjoin the Defendants from enforcing the filing deadlines in N.C. Gen. Stat. § 163.96 that require new party candidates for president and vice president to submit their petitions to qualify for the general election ballot by May 17 in an election year to county boards of election and by June 1 to the State Board of Election. The matter, fully briefed by both parties and heard by the Court during May 8, 2012 oral arguments, is ripe for determination. For the reasons set forth below, the Court DENIES Plaintiffs' Motion.

### I. THE STANDARD FOR GRANTING A PRELIMINARY INJUNCTION

Following the Supreme Court's preliminary injunction standard set forth in *Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365 (2008), the Fourth Circuit held that a

preliminary injunction will issue if the plaintiff establishes "'(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest.'" *The Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342, 346 (4th Cir. 2009) (quoting *Winter*, 129 S.Ct. at 374).

## II. BACKGROUND

### 1. The Parties

Plaintiff North Carolina Constitution Party ("Constitution Party") is an organized political party affiliated with the national Constitution Party. Amended Complaint at ¶ 3. Plaintiff Al Pisano, a resident of Charlotte, North Carolina, is Chairperson for, and a member of, the North Carolina Constitution Party. *Id* at ¶ 4.

Plaintiff North Carolina Green Party ("Green Party") is an organized political party affiliated with the Green Party of the United States. *Id* at ¶ 5. Plaintiff Nicholas Triplett, a resident of Charlotte, North Carolina, is the Vice Chairperson of legislative affairs for, and a member of, the Green Party. *Id* at ¶ 6.

Defendants are all citizens and residents of the State of North Carolina. *Id* at ¶ 7. Defendant Gary O. Bartlett is the Executive Director of the North Carolina State Board of Elections. *Id* at ¶ 8. Defendant Larry Leake is the Chairman and a member of the North Carolina State Board of Elections. *Id* at ¶ 9. Defendant Robert Cordle is the Secretary and a member of the North Carolina State Board of Elections. *Id* at ¶ 10. Defendants Charles Winfree and Ronald G. Penny are also members of the North Carolina Board of Elections. *Id* at ¶ 11.

### 2. Statement of the Facts

North Carolina elections statutes provide three ways for a candidate to obtain a spot on

the general election ballot for any partisan federal, state, county or municipal office. First, candidates can be nominated by a recognized political party. A party is considered a recognized political party if it polled in the last general election for its "candidate for Governor, or for presidential electors, at least two percent (2%) of the entire vote cast in the State" for those offices. N.C. Gen. Stat. § 163-96(a)(1). The Democratic, Republican, and Libertarian Parties qualified as recognized political parties in the 2008 elections under this provision. See Defendants' Response, Ex. 1, Bartlett Affidavit at ¶ 6. Those parties will nominate candidates in the primaries held on May 8, 2012. Their Presidential and Vice-Presidential candidates are nominated in conventions.

Second, a candidate can be nominated by a new political party. A group may qualify as a new political party by meeting the petition requirements of N.C. Gen. Stat. § 163-96(a)(2) and (b1). A new party must collect signatures on petitions signed by registered and qualified North Carolina voters "equal in number to two percent (2%) of the entire vote cast in the State for Governor or for presidential electors," with 200 signatures from registered voters from each of four congressional districts in North Carolina. The petitions must be submitted to the county boards of elections by May 17 for verification so that they may be submitted to the State Board of Elections by June 1. In 2012, the required number of signatures is 85,379. See Defendants' Response, Ex. 1, Bartlett Affidavit at ¶ 6. On April 13, 2012, the State Board of Elections certified Americans Elect as a new party for inclusion on the 2012 general election ballot. *Id*. For the first general election following qualification, a new party nominates candidates at a nominating convention held by July 1. N.C. Gen. Stat. § 163-98.

Third, a candidate may gain a spot on the ballot via nomination by petition as an unaffiliated candidate. N.C. Gen. Stat. § 163-122. A candidate may also qualify for non-

municipal partisan races as a write-in candidate by meeting the requirements of N.C. Gen. Stat. § 163-123, but that candidate's name will not appear on the ballot.

On April 17, 2012, there were 6,289,077 registered voters in North Carolina. *See* Defendants' Response, Ex. 1, Bartlett Affidavit at ¶ 10. The Constitution Party submitted petitions to county boards of elections with 2,827 signatures verified and the Green Party submitted no petitions. *Id*. The Green Party, however, claims that is has approximately 3,500 signatures prepared for submission. *See* Declaration of Nicholas Triplett at ¶ 8.

In North Carolina, a group is not limited to a time period for gathering petition signatures. A group has three and one-half years beginning immediately after the preceding presidential and gubernatorial elections. Potentially, a group has an even longer time period because North Carolina election statutes do not set a start date on the signature collection process. There are numerous opportunities for groups to collect signatures in North Carolina, such as at fairs, athletic events, college campuses, churches, and civic groups. *See* Defendants' Response, Ex. 1, Bartlett Affidavit. Groups may also, for example, collect signatures in many public places.[1] Additionally, North Carolina does not restrict who may collect petition signatures and allows registered voters to sign multiple petitions.[2]

The Constitution Party seeks new party status in North Carolina, but it is not a new organization. Rather, it dates its organization under the original name "U.S. Taxpayers Party" to 1992. The name changed to "Constitution Party" in 1999. *See*

---

[1]Central business districts in North Carolina cities such as Charlotte, Raleigh, Greensboro, Durham, Winston-Salem, Asheville, and Wilmington, just to name a few, can be particularly busy with pedestrian traffic during the morning, at lunch time, and in the afternoon on business days.

[2]In 2004, the language of the petition was revised so that a signer no longer is affirming that they intend to organize the party. N.C. Gen. Stat. § 163-96(b).

www.constitutionparty.com/press_kit.php (last visited May 4, 2012). The Green Party dates its organization in the United States to 1984, and presently 133 members hold office in 25 states and the District of Columbia. *See* www.gp.org/elections/officeholders/index.php (last visited May 4, 2012).

### 3. Plaintiffs' Contentions

Plaintiffs allege that the two percent requirement contained in N.C. Gen. Stat. ¶ 163-96 is one of the highest petition requirements in the country, and that the May 17 deadline imposes severe, unwarranted, and unnecessary burdens on the Plaintiffs' abilities to place their parties' nominees for President and Vice President on the general election ballot. Amended Complaint at ¶¶ 24-25. Furthermore, Plaintiffs claim that North Carolina lacks any rational basis or compelling reason to allow the Republican and Democratic Parties until August and September to make their nominating decisions for President and Vice President while requiring plaintiffs and other third parties to submit their nominating petitions in the middle of May. *Id* at ¶ 26. As a point of clarification, the Court notes that the May 17 deadline is for the submission of petitions signed by registered voters in support of the formation of the new party while the nominees of the party are named in a convention held by July 1. N.C. Gen. Stat. § 163-98.

Plaintiffs contend that the requirements of N.C. Gen. Stat. § 163-96 severely burden the ability of new parties to place their candidates for President and Vice President on the general election ballot and therefore violate Plaintiffs' First and Fourteenth Amendment rights, which are protected by the United States Constitution and by 42 U.S.C. § 1983. *Id* at ¶ 28. Additionally, Plaintiffs claim that N.C. Gen. Stat. § 163-96 violates Plaintiffs' rights protected by the Equal Protection Clause in the Fourteenth Amendment to the United States Constitution and by 42 U.S.C. § 1983 because it imposes a more severe burden on new party candidates for

President and Vice President to qualify as party nominees for the general elections ballot than that imposed on the "major" political party candidates. *Id* at ¶ 29. Thus, Plaintiffs request that the Court enter a preliminary and permanent injunction barring Defendants from enforcing the requirement in North Carolina General Statute § 163-96 that new party candidates for President and Vice President must submit their petitions to qualify for the general election ballot to county boards of election by May 17 and by June 1 to the State Board of Elections.

Plaintiffs do not suggest a substitute filing deadline that they contend would be constitutional. Rather, Plaintiffs ask the Court to extend the deadline for submitting new party petitions indefinitely. Additionally, Plaintiffs do not challenge the number of signatures required for new ballot access, a requirement upheld by the Fourth Circuit. *See McLaughlin v. North Carolina Bd. of Elections*, 65 F.3d 1215, 1226 (4th Cir. 1995).

### III. ANALYSIS

**1. Plaintiffs are Unlikely to Succeed on the Merits**

**A. Plaintiffs' claims are barred by the doctrine of laches**

Laches is an affirmative defense to claims for equitable relief. *White v. Daniel,* 909 F.2d 99, 102 (4th Cir. 1990), cert. denied, 501 U.S. 1260, 111 S.Ct. 2916 (1991); *see Environmental Defense Fund, Inc. v. Alexander,* 614 F.2d 474, 478 (5th Cir. 1980), cert. denied, 449 U.S. 919, 101 S.Ct. 316 (1980).

Laches requires the proof of two elements: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense. *See Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534 (1961); *White*, 909 F.2d at 102. As stated by the Fourth Circuit in *White*, the first element of laches is a lack of diligence, when "the plaintiff delayed inexcusably or unreasonably in filing suit." See *White*, 909 F.2d at 102 (citing *Nat'l*

*Wildlife Fed'n v. Buford*, 835 F.2d 305, 318 (D.C. Cir. 1987)). The second element is prejudice to the defendant. The defendant must prove that he suffered a disadvantage or some other harm caused by reliance on the plaintiff's conduct. *See White*, 909 F.2d at 102 (citing *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 844 (D.C. Cir. 1982)). Prejudice can be inferred simply from the plaintiff's delay, or from evidence of specific harm. *Id.* The greater the delay, the less the prejudice required to show laches. *Id.*

Here, Plaintiffs were permitted to collect the requisite signatures for ballot access beginning at any time after the last election.[3] Neither N.C. Gen. Stat. § 163-96, nor any other North Carolina election statute, prescribes a start date for signature collection. N.C. Gen. Stat. § 163-96 merely requires that the requisite number of signatures be submitted by particular dates. 85,349 valid signatures are currently required to meet the two-percent requirement of N.C. Gen. Stat. § 163-96. Plaintiffs' Reply at 7, Exhibit A, Winger Affidavit at ¶ 8. Plaintiff Green Party estimates that it obtained approximately 3,500 signatures to date. Plaintiffs' Reply at 8. The Constitution Party submitted petitions to county boards of elections with 2,827 signatures verified. See Defendants' Response, Ex. 1, Bartlett Affidavit at ¶ 10. The Court finds that the low number of signatures collected by Plaintiffs shows an overall lack of diligence on their behalf in attempting to meet the requirements of N.C. Gen. Stat. § 163-96. In fact, the low number of signatures collected by Plaintiffs would not even satisfy the requirement, 5,000 signatures, for new party qualification under the 1983 predecessor statute to N.C. Gen. Stat. § 163-96. Exhibit A to Plaintiffs' Reply, Winger Affidavit at ¶ 6; see Chapter 576, session laws of 1983, p. 506. Additionally, Plaintiffs should be aware of North Carolina's two-percent requirement and of the fact that the two-percent requirement was upheld by both the Fourth

---

[3] Plaintiffs could begin the signature collection process before the last general election for governor, because the statutory scheme does not prescribe a start date.

Circuit and the North Carolina Supreme Court.  *See McLaughlin v. North Carolina Bd. of Elections*, 65 F.3d 1215, 1226 (4th Cir. 1995); *see also Libertarian Party of N.C. v. State*, 365 N.C. 41, 52, 707 S.E.2d 199, 206 (N.C. 2011).

As for the second prong of the laches defense, prejudice to the Defendants, it is clear that Defendants will be harmed by Plaintiffs' delay because Plaintiff's delay threatens to significantly disrupt the election process.  As the Fourth Circuit recently noted, "applications for a preliminary injunction granting ballot access have been consistently denied [by the Supreme Court] when they threaten to disrupt an orderly election."  *Perry v. Judd*, No. 12-1067, 2012 WL 120076, at *8 (4th Cir. Jan. 17, 2012).  Additionally, N.C. Gen. Stat. § 163-96 requires that new parties meet the two-percent signature collection threshold and turn the collected signatures into the county and state boards of elections by certain dates.  This requirement serves the valid purpose of limiting ballot access to candidates with sufficient support and a viable chance in the election.  Candidates lacking such support have the potential to needlessly complicate the ballot and the counting of votes.  The two-percent signature requirement is plainly constitutional, as discussed above.  Plaintiffs simply failed to collect the requisite number of signatures to file for new party status.  The number of signatures collected is so low that Plaintiffs ability to get on the ballot by a later alternative date to be set by the Court, a date that Plaintiffs themselves do not even suggest, is probably impossible.

Accordingly, the Court finds that the Plaintiffs slept on their rights to the detriment of the Defendants and the Motion for Preliminary Injunction is barred by laches.  This decision on laches resolves the motion, but the Court will address the other issues raised by the parties to allow a complete review in the event of an appeal.

## B. Even if Plaintiffs' Claims are Not Barred by the Doctrine of Laches, Plaintiffs Fail to Demonstrate a Likelihood of Success on the Merits

### i. The Framework for Considering Challenges to Ballot Access Statutes

States have significant latitude under the Constitution in structuring their own election law. The right to vote in any manner and the right to associate for political purposes through the ballot are not absolute. *Munro v. Socialist Workers Party*, 479 U.S. 189, 193, 107 S.Ct. 533 (1986).

The Supreme Court set forth the initial test for evaluating election law claims in *Anderson v. Celbrezze*, 460 U.S. 780, 103 S.Ct. 1564 (1983), and has since clarified the *Anderson* test to direct that:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule."

*Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059 (1992) (internal citations omitted). In addition to its explicit endorsement of the *Anderson* approach, the *Burdick* Court reaffirmed the clarification that when an election law subjects constitutional rights to "severe" restriction, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Id*. (citing *Norman v. Reed*, 502 U.S. 279, 288-89, 112 S.Ct. 698 (1992).

Under the *Anderson* framework, election laws are usually subject to an *ad hoc* balancing. *Greene v. Bartlett*, No. 5:08-CV-0888-GCM, 2010 WL 3326672, at *3 (W.D.N.C. Aug. 24, 2010). While severe burdens on protected interests are subject to strict scrutiny, a rational regulation that imposes only moderate burdens could fail the balancing test if the interests it serves are minor. *Id*. Alternatively, a regulation that serves no discernable state interest would not fail the balancing test if it imposes no burden. *See McLaughlin*, 65 F.3d at 1221, n. 6.

### ii. State's Interest in Limiting Ballot Access

It is well settled that the State has a legitimate interest in limiting access to the ballot in order to prevent ballot clutter and voter confusion, and to discourage frivolous candidates. *Greene*, 2010 WL 3326672 at *3. "We have recognized that, 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Anderson*, 460 U.S. at 788 (quoting *Storer*, 415 U.S. at 730). Regarding the deadlines at issue in N.C. Gen. Stat. § 163-96, "the State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates." *Id* at 788. Furthermore, the Supreme Court "never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Munro*, 479 U.S. at 194. Such a requirement would ensure a state's political system must sustain a certain level of damage before the legislature could take corrective action. *Id*. at 195.

### iii. North Carolina's Petition Filing Deadline Requirements for New Parties

Plaintiffs contend that the filing deadline requirements of N.C. Gen. Stat. § 163-96(a)(2) and (b1) impose unnecessary and unduly severe burdens on their rights and on the rights of Constitution and Green Party members and supporters to associate and to advance the party's platform and candidates. Plaintiffs also claim that the May 16 deadline creates an unjustified discrimination against the Constitution and Green Parties because the State allows statewide unaffiliated candidates until June 14 to submit their signatures.

A court must determine if "the totality of the [state's] restrictive laws taken as a whole

imposes a[n unconstitutional] burden on voting and associational rights." *McLaughlin*, 65 F.3d at 1223 (citing *Williams v. Rhodes*, 393 U.S. at 34). As the Court in *Storer* further notes, "a number of facially valid election laws may operate in tandem to produce impermissible barriers to constitutional rights." 415 U.S. at 737. As other federal circuit courts facing similar challenges to state ballot access restrictions upheld deadlines similar to North Carolina's, this Court must look towards the totality of the burden placed upon a new political party in determining whether the filing deadline requirements are unconstitutional.

The Court will follow the Fourth Circuit's lead in *McLaughlin* and analyze the filing deadline requirements for new parties under strict scrutiny. 65 F.3d at 1221. Therefore, the filing deadline requirements of N.C. Gen. Stat. § 163-96 will be upheld only it those requirements are narrowly tailored to advance a compelling state interest. This Court will address the constitutionality of (1) the impact of the filing requirement deadlines on Plaintiffs' First and Fourteenth Amendment rights of political participation, and (2) the disparity in the date of the filing deadline requirement for unaffiliated candidates and new party candidates.

### (1) The Impact of N.C. Gen. Stat. § 163-96 Petition Filing Deadline Requirements on Plaintiffs' First and Fourteenth Amendment Rights

The Court finds that the filing deadline requirements have no impact on Plaintiffs' First and Fourteenth Amendment rights of political participation. The deadlines in N.C. Gen. Stat. § 163-96 are immaterial to Plaintiffs' ability to participate in the political process. Rather, it is the signature collection requirements that severely impact Plaintiffs' ballot access, and the Fourth Circuit previously applied strict scrutiny to hold that the signature collection requirements of N.C. Gen. Stat. § 163-96 do not unconstitutionally burden rights guaranteed by the First and Fourteenth Amendments. *McLaughlin*, 65 F.3d 1215.

Even if this Court found that the filing deadline requirement significantly impacted Plaintiffs' rights of political participation, then the filing deadlines are constitutional. The deadlines are narrowly tailored to advance a compelling government interest. The Supreme Court "long has recognized that state have important and compelling interests in regulating the election process and in having ballot access requirements." *Green v. Mortham*, 155 F.3d 1332, 1335 (11th Cir. 1998) (collecting cases). Particularly, the Supreme Court emphasized that a state has an "important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot - the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Jenness*, 403 U.S. at 442. The deadlines in N.C. Gen. Stat. § 163-96 serve North Carolina's compelling interests in regulating the election process and in having ballot access requirements. N.C. Gen. Stat. § 163-96 is narrowly tailored to advance the State's compelling interests because any burden imposed on Plaintiffs by the filing deadline is significantly lessened by the alleviating factors in the overall statutory scheme. North Carolina: (1) sets no time limit on the time period in which signatures could be gathered; (2) does not preclude voters from signing petitions based on party affiliation; (3) does not restrict new parties seeking signatures from obtaining signatures from persons who signed other petitions; (4) does not restrict how may signatures could come from a specific geographic area; (5) does not restrict how many signatures could be submitted to attempt to meet the two-percent requirement; and (6) allows unlimited time to conduct the petitioning. *See Swanson v. Worley*, 490 F.3d 894 (11th Cir. 2007) (listing alleviating factors in Alabama's statutory scheme and upholding Alabama's filing deadline with a three-percent signature requirement). Thus, Plaintiffs had at least three-and-one-half years since the last general election for Governor, and potentially even longer than

that, to collect the required number of signatures on their new party petitions in order to timely file sufficient petitions. This extended time period provided Plaintiffs ample time to comply with the North Carolina's new party petition filing deadlines.

### (2) The Disparity in the Date of the Petition Filing Deadline Requirements for Unaffiliated Candidates and New Party Candidates

The Court finds no equal protection violation because new party candidates and unaffiliated candidates are not similarly situated. Courts in *Delaney v. Bartlett*, 370 F. Supp. 2d 373 (M.D.N.C. 2004), and *Greene*, 2010 WL 3326672 at *4-5, recognized the distinction between a new party and an unaffiliated candidate. In *Greene*, the Court found that unaffiliated candidates and new party candidates are not similarly situated. 2010 WL 3326672 at *4. Furthermore, a political party is fundamentally different from an unaffiliated candidate because a party is an affiliation. Finally, North Carolina's statutory scheme provides the same petition requirements (collection of signatures of two-percent of the total number of voters who voted in the most recent general election for governor and at least 200 registered voters from each of four congressional districts in North Carolina) in order for both new party candidates and unaffiliated candidates to gain access to the ballot. See N.C. Gen. Stat. §§ 163-96 and 163-122. The Court finds that the petition filing deadlines are immaterial in light of the signature collection requirements and that, if material, the deadlines are narrowly tailored to advance a compelling government interest.

The Court notes that Plaintiffs, in their Amended Complaint, contend an equal protection violation based on the severe burden placed on new party candidates when compared to "major party" candidates. The Court finds no equal protection violation on this basis, because Democratic and Republican Party candidates are already qualified as recognized political parties

based on their performance in the 2008 elections under the provision in N.C. Gen. Stat. § 163-96(a)(1).[4] A recognized political party in North Carolina is not similarly situated to a group seeking qualification as a new political party.

## 2. Plaintiff's Will Not Suffer Irreparable Harm Absent Injunctive Relief

Plaintiff Green Party estimates that it obtained approximately 3,500 signatures to date. Plaintiffs' Reply at 8. The Constitution Party submitted petitions to county boards of elections with 2,827 signatures verified. See Plaintiffs Response, Ex. 1, Bartlett Affidavit at ¶ 10. Plaintiffs' signature collection efforts are woefully short of the more than 85,000 signatures needed in order to qualify as a new party on the 2012 general election ballot. In fact, the low number of signatures collected by Plaintiffs would not even satisfy the requirement, 5,000 signatures, for new party qualification under the 1983 predecessor statute to N.C. Gen. Stat. § 163-96. Exhibit A to Plaintiff's Reply, Winger Affidavit at ¶ 6; see Chapter 576, session laws of 1983, p. 506. The Court finds that the Plaintiffs will not suffer irreparable harm absent injunctive relief because, it would be highly unlikely for Plaintiffs to collect more than 80,000 signatures within a several week or several month time frame given that Plaintiffs collected less than 4,000 signatures since the results of the last election for Governor were reported. Additionally, Plaintiffs could seek to qualify their candidates as write-in candidates pursuant to N.C. Gen. Stat. §163-123. Rather, Defendants would be harmed if the Court granted the injunctive relief sought because the issuance of an injunction, approximately six months shy of the general election, has the potential to cause significant disarray in the Board of Election's preparation for the upcoming election.

In contrast to Plaintiffs, new party Americans Elect, in this election cycle, and other

---

[4] The Libertarian Party is qualified as a recognized political party for the same reason as the Democratic and Republican Parties.

parties, in past cycles, achieved ballot access through the petition process. See Plaintiffs' Response, Exhibit 1, ¶ 9. The success of other parties in obtaining ballot access in North Carolina demonstrates that the States' ballot access requirements are not overly stringent. Additionally, North Carolina permits signatures to be collected for most of the four-year presidential election cycle, and potentially for an even longer period than that, while some other states restrict the collection period to only a few months. *See, e.g. Libertarian Party of Oklahoma v. Oklahoma State Elections Bd.*, 593 F.Supp. 118, 121 (W.D. Okla. 1984).

Here, any harm to the Plaintiffs is solely attributable to their inability to collect the requisite number of signatures in order to qualify as new parties on the general election ballot. Thus, Plaintiffs will suffer no harm from the petition deadlines because Plaintiffs cannot turn in adequate petitions to meet the deadlines at issue.

### 3. The Balance of Equities Favors the Defendants

Any harm to the Plaintiffs in this case is of their own doing, their failure to collect the requisite number of signatures, and is not attributable to the petition filing deadline. It is the duty of the Defendants to manage a fair and orderly election process, and the issuance of an injunction would harm the Defendants' ability to carry out their duty. *Libertarian Party of Illinois v. Rednour*, 108 F.3d 768 (7th Cir. 1997). Prohibiting the State from relying on N.C. Gen. Stat. § 163-96 would leave it vulnerable to voter confusion, ballot overcrowding, and frivolous candidacies. The State has a compelling interest in avoiding such. *See Jenness v. Fortson*, 403 U.S. 431, 442 (1971); *American Party of Texas v. White*, 415 U.S. 767, 782 (1974).

### 4. The Public Interest Will be Harmed by the Issuance of a Preliminary Injunction

A state has "not only an interest, but also a duty to ensure that the electoral process produces order rather than chaos." *Libertarian Party of Illinois v. Rednour*, 108 F.3d 768 (7th

Cir. 1997). Thus, the State of North Carolina has an interest in preventing a grocery list of candidates, minimizing voter confusion, discouraging frivolous candidates and promoting fair, honest and orderly elections. *Jenness v. Fortson*, 403 U.S. 431, 442 (1971) ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot - the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election."). States have a vital and compelling interest in requiring "political parties appearing on the general ballot [to] demonstrate a significant, measurable quantum of community support." *American Party of Texas v. White*, 415 U.S. 767, 782 (1974).

Here, Plaintiffs ask this Court to ignore the required showing of a "significant modicum of support" by prohibiting enforcement of the petition deadlines even though Plaintiffs presented no evidence of their ability to collect the requisite signatures, a requirement they have not challenged. Enjoining the enforcement of the deadlines in N.C. Gen. Stat. § 163-96 would leave the State without a timetable for regulating ballot access for potential new parties and could cause a great deal of confusion in this year's elections. An injunction would essentially eviscerate all of the requirements of N.C. Gen. Stat. § 163-96, and the State would be left with no way of determining what parties should appear on the ballot. Thus, it is clear that the public interest would be harmed by the issuance of an injunction.

## IV. CONCLUSION

Based upon the foregoing, IT IS HEREBY ORDERED that Plaintiffs' Motion for a Preliminary Injunction is DENIED.

IT IS SO ORDERED.

Signed: May 10, 2012

Graham C. Mullen
United States District Judge